## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**MAX MCCOY,**

      **Plaintiff,**

**v.**                                                        **Case No. 3:18-CV-01297-NJR**

**LT. LUCAS MENNERICH,**

      **Defendant.**

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is Defendant Lucas Mennerich's Motion for Judgment as a Matter of Law and other Post-Trial Relief. (Docs. 136, 137). Plaintiff Max McCoy filed a response in opposition to the motion. (Doc. 142). For the reasons set forth below, the motion is denied.

### BACKGROUND

Plaintiff Max McCoy, a prisoner in custody of the Illinois Department of Corrections ("IDOC"), initiated this action pursuant to 42 U.S.C. § 1983 alleging that his constitutional rights were violated by several correctional officers while incarcerated at Menard Correctional Center ("Menard"). (Doc. 1). While initially proceeding *pro se*, counsel was appointed for McCoy on October 31, 2018. (Doc. 37). McCoy's claims stem from an incident on June 16, 2017, where Defendants Lucas Mennerich, Kellie Ellis, and Tyler Jones allegedly assaulted McCoy at various times, including by yelling racial slurs at him and physically assaulting him while restrained. (Doc. 48).

In February 2022, this case proceeded to jury trial on McCoy's claims of excessive force

in violation of the Eighth Amendment against Mennerich, Ellis, and Jones, and for use of racial slurs and discrimination in violation of the Fourteenth Amendment's Equal Protection Clause against Ellis and Jones. (Doc. 111). After a three-day trial, the jury found for McCoy on his excessive force claim against Mennerich and awarded $45,000 in compensatory damages and $15,000 in punitive damages. (Doc. 128). As to the other defendants, Ellis and Jones, the jury found for them on all counts. (*Id.*). Mennerich now argues that no reasonable jury could have reached the verdict against him based on the evidence presented at trial, and, thus, he is entitled to judgment as a matter of law. Alternatively, Mennerich argues that he should be given a new trial based on several errors during trial. Mennerich also asserts that he is entitled to qualified immunity. Mennerich ultimately asks the Court to vacate the verdict and damages assessed against him and grant judgment as a matter of law or a new trial.

## EVIDENCE AT TRIAL

Over the course of the three-day trial, the jury heard evidence from both sides, including witness testimony, video evidence, and several documentary exhibits. McCoy testified along with each of the defendants—Mennerich, Ellis, and Jones. Bobby Johnson and Adam Titus, two other prisoners at Menard during the incident, testified as well. The jury also heard testimony from a nurse at Menard, Augusta Williams, the current warden and former Lieutenant at Menard, David Mitchell, and a state investigator, Jason Bradley.

In the late morning of June 16, 2017, colloquially dubbed the "Father's Day melee," one end of the yard at Menard devolved into a frenzy as Bobby Johnson, a non-party prisoner and witness during trial, engaged in an altercation with a correctional officer outside Menard's multipurpose building during transfer from recreation to his cell block. (Docs. 132, pp. 22-23, 45, 64, 87; 134, pp. 294-95). Meanwhile, other prisoners, including McCoy,

continued with recreation time or lined up to be transferred. (Doc. 134, p. 284). McCoy, a member of the "striper" gallery (the cell block housing prisoners who have weapon or staff assault infractions marked with a black stripe on their clothing), looked around in the gym only to realize all the other "stripers" were gone. (Docs. 132, pp. 9, 78; 134, pp. 240, 284). He hurriedly walked out the doors towards the yard to catch up with his gallery. (Doc. 134, pp. 284, 291-92). Funneled into a padlocked, six-by-thirty-foot walkway between the gym and the rest of the yard, McCoy reunited with some members of his gallery who were lining up. (Docs. 132, pp. 63-64, 91; 134, pp. 284, 293). To manage the transfer of prisoners from recreation in the multipurpose building back to the cell house, guards released prisoners in small groups for pat-downs and transfer. (Doc. 132, pp. 51-53).

Shortly after McCoy caught up to his gallery, an officer on the yard fired warning shots, given the unfolding skirmish involving Bobby Johnson, and the prison launched into lockdown. (Doc. 134, pp. 294, 296, 301, 347-48). Protocol and—according to McCoy—instinct dictated that prisoners lay prostrate after the warning shots. (Docs. 132, pp. 65, 103; 134, pp. 223, 296, 347-49). As the conflict on the yard resolved, correctional staff returned to the gate of the padlocked walkway. (Doc. 132, pp. 58-59). Several "white-shirts," the signal of a lieutenant rank, were stationed by the gate including David Mitchell,[1] a non-party officer and witness during trial, and defendants Mennerich and Ellis. (*Id.* at pp. 21-22, 63, 86). Mennerich was the designated yard lieutenant for the day and possessed the keys to the gated walkway. (*Id.* at pp. 87, 126-27).

Here's where the stories diverge. According to Mennerich, McCoy kept springing to

---

[1] David Mitchell has since been elevated to the position of Warden, but on June 16, 2017, he held the Lieutenant title. (Doc. 135, p. 404).

his knees to look around, instead of laying down as instructed. (*Id.* at p. 92). McCoy indignantly ignored orders from officers outside the gate to stay down. (*Id.* at pp. 92, 103-04). Mitchell testified that McCoy crouched on the balls of his feet in somewhat of a squat. (Doc. 135, p. 434). Mennerich opened the gate, and Mitchell entered the area to confront McCoy. (Docs. 132, pp. 92, 127; 135, pp. 433, 435). At this point, Mitchell commanded McCoy to get down and "cuff up," known in the prison context as submitting to be handcuffed. (Doc. 132, p. 105). McCoy bounced to his knees and struck Mitchell in the face.[2] (*Id.* at p. 93).

The accounts of Mennerich and Mitchell differed slightly as to their efforts to subdue McCoy. Mennerich recounted that both he and Mitchell mounted McCoy and placed mechanical restraints on McCoy despite zealous physical resistance. (*Id.* at pp. 93, 111-12). Mennerich detailed that he bumped Mitchell off McCoy and both officers, each taking one arm, secured the handcuffs together. (*Id.*). Mitchell testified that he played no part in securing the restraints. (Doc. 135, pp. 408, 436). According to both officers, Mitchell was positioned at McCoy's legs and lower body, and Mennerich placed his body onto McCoy's back, facing McCoy's lower body, to leverage his arms into restraints. (Docs. 132, pp. 115, 121; 135, pp. 418-19). While being handcuffed, McCoy's face pressed into the rocky gravel and concrete chunks that coated the walkway floor. (Doc. 132, p. 112). Soon, correctional staff swarmed the area because of the staff assault on Mitchell. (*Id.* at pp. 59, 129). Mennerich claimed that other officers assisted in picking up McCoy, once restrained, and that Mennerich handed McCoy over to those other officers for escort to healthcare. (*Id.* at pp. 93, 117). Mitchell

---

[2] An Adjustment Committee found McCoy guilty of violations for violent assault, dangerous disturbance, and disobeying a direct order essential to safety and security. (Doc. 135, p. 417). He received six months C grade, six months segregation, a good-time credit revocation, and a six-month contact visit restriction. (*Id.*).

testified that Mennerich got McCoy off the ground, and someone escorted McCoy to North 2. (Doc. 135, p. 408). Mennerich testified that McCoy did not pose a large enough threat to deploy mace, which he had on him at the time. (Doc. 132, p. 128). He also testified that deploying mace requires reporting. (*Id.* at p. 113).

Turning to McCoy's account, when shots were fired after the Bobby Johnson altercation, he dropped to the ground and never attempted to pop up. (Doc. 134, p. 258). McCoy described his ongoing lower body pain for which he was scheduled to see medical staff later that day. (*Id.* at pp. 255-58). He experienced ongoing pain in his foot and leg stemming from a toe injury that created challenges with lower body movement. (*Id.* at p. 256). McCoy testified that he had difficulty squatting and sometimes ambulating from the pain. (*Id.*). He avoided intense physical activity that engaged the lower body like sports, running, or stretching, focusing solely on his upper body during exercise. (*Id.* at pp. 256-57, 370). McCoy noted that it would be difficult for him to pop up from laying on the ground or to squat, as Mennerich and Mitchell described. (*Id.* at p. 258). Thus, he emphasized that he remained on the ground with his chin down in the rocks. (*Id.* at pp. 295, 371). McCoy also highlighted his slight stature at the time, measuring five-foot-five-inches tall and weighing 130 pounds, as compared to the two officers subduing him. (*Id.* at pp. 185-86, 338-39).

As McCoy narrated the surveillance video of the incident, he called attention to the fact that the only people standing were "white shirts," while everyone else remained on the ground, including him. (*Id.* at p. 297). Ellis also testified, as she watched the same video, that the prisoners in the walkway all appeared to be laying down on the ground. (Doc. 132, pp. 58-59). Mennerich opened the gate, and Mitchell approached McCoy commanding him to "cuff up." (Doc. 134, pp. 284, 306). Confused, McCoy asked why he needed to cuff up as he was

complying, laying on the ground, and staying there. (*Id.* at pp. 284, 350). Mitchell called McCoy a racial slur and proceeded to put his knee or foot into McCoy's back to administer handcuffs. (*Id.* at pp. 284-85). Irritated and offended, McCoy flipped onto his back and swung up at Mitchell landing only his initial punch. (*Id.* at pp. 285, 372). Mitchell responded with a throat punch causing McCoy to lose his breath. (*Id.* at p. 285). McCoy momentarily blacked out. (*Id.* at pp. 285, 309). McCoy recounted that Mennerich also struck him. (*Id.* at p. 308).

After McCoy hit Mitchell, Mennerich helped Mitchell subdue McCoy, and in doing so, McCoy remembered that Mennerich applied pressure to his legs, twisting them using a great amount of strength. (*Id.* at pp. 308, 338). McCoy stated that Mitchell put the cuffs on him with a knee in his back. (*Id.* at p. 308). Mennerich continued applying pressure to McCoy even when he was already restrained. (*Id.* at p. 338). The video evinced a swarm of other officers entering the fenced walkway. (*Id.* at p. 299). While handcuffed and on the ground, a group of officers proceeded to kick McCoy, pin him down, put their feet on his neck, including Ellis, and push him up against the fence all while hurling racist insults at McCoy. (*Id.* at p. 309). McCoy asserted that Mennerich stayed in the walkway when the officers came in, but does not recall seeing Mennerich's face during this beating. (*Id.* at pp. 308-09).

Adam Titus, another prisoner, testified that the altercation involving McCoy caused the other prisoners in the walkway to be thrown on the ground and handcuffed. (*Id.* at p. 206). As Titus stood up, he saw McCoy get thrown against the gate with ten to fifteen officers punching, kicking, and kneeing him. (*Id.* at p. 206). Titus described McCoy's condition at the time, that his face and head were bleeding and that he could barely walk. (*Id.*). At this point, Titus testified that guards used racially charged and derogatory language while transporting prisoners back to segregation towards healthcare. (*Id.* at p. 207). Mennerich told his fellow

officers, "You all know what to do," while they escorted McCoy away. (*Id.* at p. 357). From afar, surveillance video captured the incident from approximately 11:10 a.m. to 11:19 a.m. (*Id.* at p. 305).

Two unknown officers escorted McCoy to North 2. (*Id.* at p. 310). Menard policy required that prisoners involved in staff assaults be promptly taken to the healthcare unit to be evaluated, physically and mentally. (Doc. 132, pp. 89, 116). The North 2 building houses the segregation unit along with many other rooms like visitation and interview rooms, as well as an infirmary. (Docs. 132, p. 116; 134, pp. 143, 148-52). Instead of heading to the medical unit, officers steered McCoy, now walking half-unconsciously, through a side door and up a stairway. (Doc. 134, p. 312). The officers dragged McCoy up the stairs by his feet allowing his face to hit every step. (*Id.*). They pulled him into the gallery landing and placed him in the shower, where he met Jones, another defendant. (*Id.* at pp. 312-13).

McCoy sustained injuries from the altercation outside, so he tried to clean the scrapes and blood on his face with water. (*Id.* at p. 315). Then Jones reemerged and instructed McCoy to bend over and walk face down as Jones escorted him elsewhere. (*Id.* at pp. 316-17). Jones brought McCoy to an interview room with a puddle of blood on the floor and proceeded to brutally beat McCoy with the help of other officers, while McCoy remained handcuffed.[3] (*Id.* at pp. 317-18). The officers used racial slurs and aggressive language. (*Id.* at p. 318). After the officers finished, McCoy returned to his cell, then Jones escorted him to the infirmary in North 2. (*Id.* at p. 324). Before medical, McCoy met with a sergeant from internal affairs investigating the assault on Mitchell. (*Id.* at p. 328). McCoy refused to answer his questions

---

[3] This narrative reflects McCoy's version of events; however, the jury returned a verdict for Jones in respect to these events.

without an attorney. (*Id.*). Bobby Johnson testified to a similar orchestrated beating after his staff assault on the yard in the same interview room in North 2. (Doc. 132, pp. 24-28, 30-34).

McCoy and Johnson were both treated for their injuries in the North 2 infirmary instead of the healthcare unit treatment room. (Doc. 134, pp. 266-67). Upon medical evaluation at 12:50 p.m., McCoy presented with a facial contusion rating his pain an eight out of ten. (*Id.* at pp. 268, 325). The medical progress notes indicated his face had swelling and discoloration. (*Id.* at p. 269). The offender injury report detailed multiple contusions to McCoy's left eye, the right side of his forehead, and on the right outer eye. (*Id.* at p. 271). For these injuries, the treating nurse prescribed an over-the-counter pain medication, the strongest medication she could offer at the time. (*Id.* at pp. 275, 279). McCoy's injuries were not photographed at Menard. (*Id.* at p. 329).

Pursuant to policy, each prisoner involved in a staff assault that day was transferred to another facility. (*Id.* at pp. 207-08). Later that evening, McCoy was transferred to Pontiac Correctional Center ("Pontiac"). (*Id.* at pp. 332-33). Adam Titus testified that he and McCoy were transferred to Pontiac in the same transport van. (*Id.* at p. 208). In the van, McCoy's face was swollen and bruised, he had cuts on his wrists, his eye was bloodshot, he had dried blood on his face coming from his head, and he was "in and out," not seeming like himself. (*Id.* at pp. 209-11). Titus testified that the swelling on McCoy's face persisted for several days, and he walked with a limp. (*Id.* at p. 213).

The transport van arrived at Pontiac in the early morning hours the following day. (*Id.* at p. 333). McCoy visited healthcare to be evaluated upon arrival. (*Id.* at pp. 333-34). Because they arrived on a Saturday, the office that issued photo IDs was closed. (*Id.* at p. 336). On Monday morning, McCoy had a photo taken, which showed some of the lingering injuries

on his face. (*Id.* at pp. 336-37).

About three weeks later, McCoy filed a grievance report describing the incident. (*Id.* at pp. 356-59). Altogether, McCoy testified that the events of that day, aside from his physical injuries, damaged him mentally and emotionally as he became scarred with respect to law enforcement, continuing to fear another incident that would force him to protect himself. (*Id.* at pp. 342-43).

With respect to the pending motion, all the evidence must be construed in the light most favorable to McCoy, and the Court can disregard any favorable evidence or inferences for Mennerich that the jury was not required to believe. *See Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 859-60 (7th Cir. 2007).

**DISCUSSION**

## I.   <u>Motion for Judgment as a Matter of Law</u>

Federal Rule of Civil Procedure 50 governs judgment as a matter of law in a jury trial. Generally, a motion for judgment as a matter of law may be raised once a party has been fully heard on an issue during jury trial any time before the case is submitted to the jury. FED. R. CIV. P. 50(a)(2). If such a motion is not initially granted, the movant may file a renewed motion for judgment as a matter of law. FED. R. CIV. P. 50(b). A court should only grant the motion when "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). In ruling on a renewed motion, "the court may: (1) allow judgment on the verdict…; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." FED. R. CIV. P. 50(b).

The law imposes a high standard for overturning a jury verdict. *Pierson v. Hartley*, 391 F.3d 898, 903 (7th Cir. 2004). In reviewing a party's motion, a court examines the evidence

presented, along with any reasonably drawn inferences, and determines whether that evidence sufficiently supports the verdict when strictly viewed in the light most favorable to the non-moving party. *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1129 (7th Cir. 1997). Of course, "a mere scintilla of supporting evidence will not suffice," but the verdict must stand unless no rational jury could have rendered such a verdict. *Walker v. Board of Regents of University of Wisconsin System*, 410 F.3d 387, 393 (7th Cir. 2005); *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 301 (7th Cir. 2010). Moreover, the court cannot engage in reweighing the evidence or making credibility assessments. *Hossack*, 492 F.3d at 860.

Mennerich argues that he is entitled to judgment as a matter of law because the evidence presented at trial demonstrates that he used minor, not excessive, force to restore order after McCoy assaulted another officer. The Eighth Amendment governs claims of excessive force in the prison context and protects prisoners from the infliction of cruel and unusual punishment, which is often defined in such context as the "unnecessary and wanton infliction of pain." *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009) (ultimately quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). The core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

This core inquiry involves the examination of a variety of factors such as the need for force, the relationship between that need and the amount of force actually used, the threat reasonably perceived by the involved officials, the efforts made to temper the severity of the forceful response, and the extent of the injury suffered by the prisoner. *Outlaw v. Newkirk*, 259 F.3d 833, 837-38 (7th Cir. 2001); *see also Hudson*, 503 U.S. at 7. Regarding the last factor, a

plaintiff need not demonstrate significant injury to state a claim for excessive force under the Eighth Amendment, but a claim cannot ordinarily be based on a *de minimis* use of physical force. *Outlaw,* 259 F.3d at 837-38. That is, not every "malevolent touch by a prison guard" will lead to a federal cause of action, even when the force later seems unnecessary. *Id.*

Here, Mennerich argues that McCoy offered no evidence to support his claim of excessive force. Specifically, Mennerich emphasizes that McCoy challenged repeated commands to "cuff up" and punched another non-party officer, Mitchell. In light of this conduct, Mennerich asserts that he, in good faith, attempted to maintain order by restraining McCoy and used only the minor force necessary to do so. Moreover, Mennerich criticizes McCoy's own testimony, that Mennerich twisted, held, or pinned his legs while he was being handcuffed, as failing to provide a sufficient basis for excessive force, especially without evidence of any corresponding leg injury.

On the other hand, McCoy argues that both direct and circumstantial evidence presented at trial established that Mennerich used excessive force in violation of the Eighth Amendment. The video evidence, McCoy asserts, provided direct evidence that Mennerich escalated an otherwise contained situation by opening the gate to the padlocked walkway, became aggressive towards McCoy, subdued McCoy, and then continued to beat him once he was handcuffed cloaked in a cloud of other officers. McCoy also cites to the Seventh Circuit's ruling in *Hendrickson v. Cooper,* 589 F.3d 887, 891-92 (7th Cir. 2009). In *Hendrickson,* McCoy explains, a correctional officer pressed his knee into a partially disabled prisoner's back escalating a verbal exchange into an orchestrated physical attack, and the Seventh Circuit affirmed that such behavior constituted excessive force after a jury found the same.

As an initial matter, Mennerich minimizes the evidence presented to the jury. It is true that several witnesses, including McCoy himself, testified that McCoy struck Mitchell creating justification for Mennerich to restrain McCoy. McCoy also testified at various times that Mennerich held his legs down and twisted his legs forcefully while Mitchell had a knee in his back. If this concluded the evidence against Mennerich, perhaps judgment as a matter of law in his favor would be in order. But this is not the end of the story or the evidence.

Along with the evidence referenced by Mennerich, the jury viewed surveillance footage multiple times. Albeit fairly eye-straining, the video generally captured the events on Menard's yard the morning of June 16, 2017. Defendant Ellis testified while watching the video, and she explained the various events unfolding on screen. McCoy did the same. During Mennerich's testimony, the video was also heavily referenced. The video evidence, while far from damning, underpinned the other testimony and evidence of the events that unfolded between Mennerich and McCoy. The jury heard Ellis and McCoy testify that the white shirt lieutenants, Ellis, Mennerich, and Mitchell, stood at the gate of the padlocked walkway as the altercation with Bobby Johnson transpired further down the yard. While Mennerich and Mitchell maintained that McCoy popped up from the ground, McCoy pointed out on the video, as did Ellis, that the prisoners all appeared to be laying down with only the white shirts standing. The video and accompanying testimony demonstrated that Mennerich and Mitchell entered the gate, engaged with McCoy, and shortly after, a swarm of other officers rushed through the gate. From this evidence, the jury could reasonably infer that Mitchell and Mennerich targeted McCoy, demonstrating bad faith or malice even before the staff assault occurred by engaging with McCoy for no reason.

Besides the video, Mennerich's own testimony is crucial. Once McCoy swung at Mitchell from the ground, the officers necessarily attempted to restrain McCoy. Mennerich testified that in effectuating such restraint, he placed his body on top of McCoy, situated on McCoy's back facing his lower body. Mitchell corroborated this testimony. Mennerich described McCoy's zealous resistance to handcuffs stating that both Mitchell and Mennerich had to each secure one arm just to get McCoy into restraints as he persisted in swinging his arms. Mitchell, however, testified that he did not secure the restraints on McCoy and instead stood feet away from Mennerich at McCoy's legs while Mennerich secured the restraints. McCoy stated that he remained on the ground the entire time, even when he swung at Mitchell. McCoy explained that he quickly blacked out, in which case he could not be resisting. Further, Mennerich testified that McCoy did not pose a large enough threat to deploy the mace he carried. While McCoy testified that *Mitchell* pressed into his back as *Mennerich* aggressively twisted his legs, the jury could reasonably have believed the account of Mitchell and Mennerich regarding their positions, as McCoy laid face down with his hands behind him and blacked out during this time.

The context outlined for the jury is relevant as well. McCoy testified that at the time of this incident he weighed 130 pounds and measured five-foot-five-inches tall. Comparatively, McCoy testified, and the jury could observe, that Mennerich and Mitchell were of much larger stature and, in McCoy's words, in great shape. Moreover, McCoy described his ongoing lower body and foot pain stemming from a toe injury. In fact, he expected to visit the healthcare unit later that day regarding this injury. So, if, instead, the jury believed McCoy's averments that Mennerich twisted his legs with forceful pressure, it is also a reasonable inference that Mennerich exploited McCoy's vulnerability in doing so.

Finally, McCoy was not pinned on a plush surface, but rather rocky gravel and concrete chunks that coated the fenced-in walkway floor, which could exacerbate the impact of any pressure applied to his body.

The video, along with McCoy's testimony, shows that a swarm of other officers rushed into the walkway. Adam Titus testified that he saw the officers thrust McCoy against the gate while punching, kicking, and kneeing him. Titus also noticed blood leaking from McCoy's head and face and that McCoy could barely walk. Mitchell testified that Mennerich got McCoy off the ground. It is reasonable to infer that Mennerich was involved in this skirmish, as he was on top of McCoy and eventually peeled him off the ground. Once Mennerich passed him to other officers, Mennerich said, "You all know what to do," as McCoy's grievance report detailed. The jury could reasonably interpret this statement as evidence of Mennerich's bad intent or motive in roughing up McCoy and pushing other officers to do the same.

McCoy testified that, while waiting to see medical, he had scrapes and blood on his face that he attempted to clean with water. Upon receiving medical attention, he presented with a facial contusion self-reporting his pain as an eight out of ten. As the medical notes indicate, McCoy had facial swelling and discoloration. Titus also testified that in the transfer van he observed that McCoy's face was swollen and bruised, he had cuts on his wrists, bloodshot eyes, dried blood on his face and head, and he was "in and out" of consciousness. McCoy testified that he blacked out while being restrained. The injuries to his face were severe enough to show up on McCoy's ID photo from Pontiac taken several days later.

McCoy detailed another sinister attack by officers before receiving medical treatment, however, Mennerich was not accused of having directly participated. Moreover, the jury

found for the defendant, Tyler Jones, who McCoy alleged oversaw and participated in this second beating. The verdict indicates that the jury did not hear sufficient evidence to substantiate these events. As such, it is reasonable that the jury attributed McCoy's documented injuries only to the events on the yard involving Mennerich.

The jury absorbed all of this evidence, together, and reached a verdict. Certainly, the jury was equipped with substantially more information to evaluate than a couple sentences of McCoy's testimony that Mennerich twisted his legs in a forceful manner. Taken together and strictly viewed in the light most favorable to McCoy, the evidence sufficiently supports the jury's verdict that Mennerich's use of force was applied maliciously and sadistically to cause harm rather than in a good-faith effort to maintain or restore discipline.

Looking at the need for force, the jury could reasonably have determined that Mennerich and Mitchell goaded McCoy into the initial staff assault by opening the locked gate and engaging with McCoy as he compliantly remained on the ground, using racial slurs, and putting a foot on his back. At that point, the officers had no reason to perceive a threat. When McCoy reactively swung at Mitchell, the officers justifiably felt threatened and needed to restrain McCoy. But McCoy testified that he was already on the ground as he swung from laying on his back and that he soon blacked out after being struck by Mitchell. From this information, a reasonable jury could infer that McCoy did not resist vigorously. Further, Mitchell testified Mennerich applied the cuffs without Mitchell's help—more evidence that McCoy was not physically resisting and flailing about as Mennerich contends. Mennerich also testified that McCoy's resistance did not pose such a threat as to warrant the use of mace. Moreover, McCoy stated that Mennerich continued to apply pressure after he was restrained, which presents a reduced need for force. In evaluating the relationship between the need for

force and the force actually used, a jury could reasonably determine that the full brunt of Mennerich's bodyweight pressing into McCoy's slight frame on a rocky gravel surface for several minutes was unnecessary to subdue McCoy, especially if the applied pressure continued after McCoy was restrained. As discussed above, a jury could reasonably infer that Mennerich was involved in the swarm of officers that proceeded to kick and step on McCoy as well, which occurred after his restraint.

Moreover, it appears there was minimal effort to temper the severity of the forceful response. There was no testimony indicating that any effort had been made to restrain McCoy other than Mennerich placing his body on top of McCoy's, aside from the fact that Mennerich did not deploy mace, which could have been a choice made to avoid paperwork. In fact, Mennerich testified that he did not think about his body's position, rather he solely focused on subduing McCoy. Mennerich did not first attempt to administer handcuffs by dropping to McCoy's side, or straddling his legs. Understandably, in subduing a prisoner events transpire quickly, however, there was no evidence that Mennerich attempted to use less force, especially given the ample evidence that McCoy was not strongly resisting and he was already on the ground.

Looking at McCoy's injuries, his medical records indicate head trauma with contusions and swelling. Other testimony painted the picture of McCoy's bloody, bruised, and swollen head and face and that McCoy remained in and out of consciousness through the transport ride later that day. Furthermore, the ID photo taken at Pontiac days later depicted the enduring swelling and bruising.

McCoy cites to the Seventh Circuit's ruling in *Hendrickson,* 589 F.3d 887 (7th Cir. 2009). In *Hendrickson,* a verbal exchange occurred between a corrections officer and a prisoner. *Id.*

at 890. Despite a lack of physical provocation, the corrections officer proceeded to grab the prisoner, throw him against a wall, slam him into the concrete floor, and press his knees into the prisoner's back while another officer applied handcuffs. *Id.* A jury found the officer liable for using excessive force in violation of the prisoners' Eighth Amendment rights. *Id.* The Seventh Circuit affirmed the jury's finding explaining that clearly the officer issued more than a mere malevolent touch or simple act of shoving as he took the prisoner to the ground and kneed him in the back. *Id.* at 891.

The facts in this case slightly differ, in that McCoy swung at an officer after he felt provoked, which created a need for restraint. The Court in *Hendrickson* also entertained the possibility that taking a prisoner to the ground and kneeing him in the back may be justified under other circumstances to restrain a dangerous prisoner. *Id.* Similarly though, as explained above, the jury could have reasonably determined that McCoy, like the prisoner in *Hendrickson*, did not pose a threat to Mennerich as he was on the ground and blacked out, yet Mennerich thrust his bodyweight on McCoy for the purpose of causing pain and continued to apply force and pressure after securing handcuffs.

Weighing all the relevant factors, the Court finds that the jury could reasonably determine that the force Mennerich applied to McCoy was excessive, that is, an unnecessary and wanton infliction of pain applied maliciously, in violation of McCoy's Eighth Amendment rights. The Court finds no reason to disturb the jury's verdict. As such, Mennerich's Motion for Judgment as a Matter of Law is **DENIED.**

## II.   <u>Motion for New Trial</u>

A renewed motion for judgment as a matter of law may include an alternative or joint request under Rule 59 for a new trial. FED. R. CIV. P. 50(b). After a jury trial, a court may grant

a new trial as to all or some of the issues, and to any party, for any reasons for which a new trial has been granted in an action at law in federal court. FED. R. CIV. P. 59(a)(1)(A). A district court has great discretion in determining whether to grant a new trial. *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992). A new trial may be warranted if the verdict is against the weight of the evidence, the damages are excessive, or if, for other reasons, the trial was unfair to the moving party. *Emmel v. Coca-Cola Bottling Co. of Chicago,* 95 F.3d 627, 636 (7th Cir. 1996). Evidentiary errors satisfy this high standard only when a significant possibility exists that they affected the outcome of the trial. *E.E.O.C. v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012). In reviewing a motion for a new trial, evidence should be viewed in the light most favorable to the prevailing party, and a jury verdict should not be set aside if a reasonable basis exists in the record which supports the verdict. *See Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1196 (7th Cir. 1992).

Mennerich argues that the jury's verdict is against the manifest weight of the evidence. Mennerich also contends that the Court erred by refusing his proposed jury instructions relating to the use of force and by allowing Bobby Johnson to testify about his alleged assault. Lastly, Mennerich asserts that the evidence presented at trial did not support the amount of compensatory and punitive damages awarded.

    a.  *Manifest Weight of the Evidence*

As discussed above, the evidence presented at trial was sufficient to support the jury's verdict, and it was reasonable for the jury to find for McCoy against Mennerich by a preponderance of the evidence. As such, the Court need not reiterate a discussion of the sufficiency of the evidence here. The Court finds that the verdict did not go against the manifest weight of the evidence.

b. *Jury Instructions*

Mennerich next argues that the Court erred in rejecting his proposed jury instruction on excessive force. Notably, the Court followed the Seventh Circuit Pattern Civil Jury Instruction § 7.18 regarding excessive force under the Eighth Amendment. Mennerich's own version largely complied with the same pattern instruction but differed in two significant ways. To find for McCoy, the Court instructed that in using force, "Defendant did so for the purpose of harming Mr. McCoy, and not in a good faith effort to maintain or restore security or order." (Doc. 126, p. 16). Mennerich urges that the Court should have instructed, "Defendant[] did so with malice or extreme or excessive cruelty for the purpose of harming Plaintiff, and not in a good faith effort to maintain or restore security or order." (Doc. 127, p. 1). And where the Court instructed that, "Defendant's conduct harmed Mr. McCoy," (Doc. 126, p. 16), Mennerich preferred the language, "Such malicious or excessively cruel conduct was the proximate cause of harm to Plaintiff." (Doc. 127, p. 1). After refusing these proposed changes, the Court also refused an instruction defining the words maliciously and sadistically, as well as an instruction stating, "not every push or shove violates the constitution." (*Id.* at pp. 4, 5, 6).

Worth noting, pattern instructions are presumed to accurately state the law. *United States v. Freed,* 921 F.3d 716, 721 (7th Cir. 2019). Further, the very modifications that Mennerich proposed were discussed by the pattern instruction committee. Comment C to Instruction 7.18 states:

> **Intentional use of force for the purpose of harm**: "Unreasonable" force is not enough in the Eighth Amendment context. *Whitley*, 475 U.S. at 322. Courts often use the phrase "malicious[ ] and sadistic[ ]" when describing the intent requirement, *id.* at 320-21, but the Committee has omitted the phrase because it appears to be redundant of the phrase "for the purpose of harming."

SEVENTH CIRCUIT PATTERN CIVIL JURY INSTRUCTION § 7.18, Comment C. The Court agrees that the terms malicious and sadistic are redundant of "for the purpose of harming." The jury received an adequate instruction regarding the law of excessive force under the Eighth Amendment. As the Court did not use the terms maliciously and sadistically in its instruction, the instructions defining such terms were also unnecessary, and, thus, refused. Finally, the proposed instruction that "[n]ot every push or shove violates the Constitution" was redundant of the Court's instructions that excessive force requires intentional force used for the purpose of harming McCoy, rather than in a good faith effort to maintain or restore order, and that the conduct harmed McCoy. This separate instruction was unnecessary. The Court finds no error regarding the challenged jury instructions and no error warranting a new trial.

   c.   *Testimony of Bobby Johnson*

Bobby Johnson, another prisoner at Menard involved in the first staff assault on the yard during the "Father's Day melee," testified at trial. (Doc. 132, pp. 6-41). Johnson recounted how he knew McCoy, general details of prison life on the striper gallery, and his memory of June 16, 2017. (*Id.*). He described the first altercation on the yard, the one in which he was involved, stating that other officers (not Defendants) called him racial slurs and grabbed his arm compelling him to punch an officer. (*Id.* at pp. 22-23). Johnson explained that he was restrained, called more racial slurs, and beaten. (*Id.* at p. 23). Then he testified that officers dragged him up the stairs of the segregation building, sprayed him with mace, and viciously assaulted him in an interview room. (*Id.* at pp. 24-28, 30-34). Before being ushered to the interview room, Johnson recalled seeing McCoy in the segregation unit. (*Id.* at p. 35). Johnson did not identify Mennerich as someone who assaulted him or someone that he

witnessed beating McCoy.

During trial, defense counsel raised objections to the relevancy of this testimony. (Notably, the objection did not relate to the inflammatory or prejudicial nature of the testimony, as argued now). The Court overruled those objections after a sidebar discussion. (*Id.* at pp. 28-30). McCoy's counsel argued that the testimony should be admissible to show intent, opportunity, preparation, and plan, where two inmates suffered through the same series of events with officers carrying out concealed and brutal beatings. (*Id.* at p. 29). Defense counsel stressed that Johnson lacked knowledge of the individuals involved in his own attack, let alone the one involving McCoy, and could not identify any of the defendants, including Mennerich, as involved. (*Id.* at p. 30). The Court permitted the testimony and allowed defense counsel to address the potential concerns on cross examination. (*Id.* at p. 30).

Generally, Federal Rule of Evidence 404 permits evidence of other wrongful acts for the purpose of "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). At sidebar, McCoy's counsel cited *Wilson v. City of Chicago* to argue that Johnson's testimony about the assault in North 2 should be admitted for the purpose of showing intent, opportunity, preparation, and plan. (Doc. 132, p. 29); 6 F.3d 1233, 1238-39 (7th Cir. 1993). Defense counsel did not address the case at sidebar or in the post-trial motion. In *Wilson,* a pretrial detainee brought a civil rights action against police officers for violating his due process rights by extracting a coerced confession through means of electroshock, torture, and beatings. *Wilson,* 6 F.3d at 1238. The Seventh Circuit held that the trial court erred in excluding the testimony of two witnesses who experienced the same treatment by the same police officers shortly before the plaintiff. *Id.* The Court explained that the testimony was relevant, and that, although evidence of prior bad

acts is inadmissible to prove a propensity to commit those acts, such evidence is admissible for purposes like intent, opportunity, preparation, and plan. *Id.*

Here, while Bobby Johnson could not identify specific officers that attacked him in the interview room, he explained generally that earlier that day he assaulted a lieutenant on the yard, officers dragged him to North 2, and then brutally beat him in an interview room. McCoy experienced a similar series of events, as he also assaulted a lieutenant, was dragged to North 2, and was brutally beaten. These alleged assaults occurred within the same couple of hours in the same room. As part of these events, McCoy pointed to Jones as his primary attacker. While Johnson's testimony did not connect Jones, or any other defendant, to his or McCoy's attacks, his testimony provided context for the motive, intent, opportunity, and plan of the corrections officers in North 2 on June 16, 2017, as permitted under Rule 404. His testimony connected to McCoy's, as well, as Johnson and McCoy saw each other while officers escorted Johnson towards the interview room. McCoy also described a pool of blood on the floor of the interview room, and Johnson's testimony provided context as to the origin of that pool of blood.

Mennerich argues that Johnson's testimony essentially bolstered McCoy's claim that officers were using racial slurs on the walk and other officers assaulted them in the North 2 cell house. Therein lies the issue with Mennerich's argument. Neither of those occurrences involved Mennerich. McCoy only accused Ellis and Jones of violating the Fourteenth Amendment's Equal Protection Clause for racially discriminating against and targeting McCoy on the basis of race. The jury found for both Ellis and Jones as to those counts. The jury also found for Jones on the Eighth Amendment violation, and Jones was the only officer allegedly involved in the beating in North 2. Even if the Court erred in allowing Johnson

to testify, there is no reason to believe that Johnson's testimony affected the outcome of this trial or that such testimony prejudiced any defendant, let alone Mennerich, who was not involved in the incidents about which Johnson testified. Further, thorough cross examination allowed Defendants to highlight for the jury the issues argued in the present motion. And evidently, it worked, as the jury found for Ellis and Jones, despite Johnson's testimony.

The Court finds that Bobby Johnson's testimony was admissible. Even if it was inadmissible, the testimony did not affect the outcome of trial as to warrant a new trial.

### d. *Compensatory Damage Award*

Mennerich first argues that no evidence presented tied his actions to the injuries suffered by McCoy, if any. The Court rejects this argument for the reasons explained above—that McCoy suffered contusions, swelling, bruising and bleeding on his head and face and lost consciousness as a result of the incident on the yard involving Mennerich, along with emotional pain and suffering. Next, Mennerich asserts that the evidence did not support the jury's $45,000 compensatory damage award.

Compensatory damages are intended to redress the concrete loss that a plaintiff has suffered by reason of the defendant's wrongful conduct. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416 (2003). To assess the reasonableness of a jury's awarded damages, courts consider: (1) whether the award is monstrously excessive; (2) if there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases. *G.G. v. Grindle*, 665 F.3d 795, 798-99 (7th Cir. 2011).

Mennerich concedes that the award is not monstrously excessive, but argues that it lacks a connection to the evidence because McCoy only received Motrin for his injuries, and

he did not sustain any lasting effect from his injuries. Mennerich also offers three cases as comparison for the verdict. These comparison cases are either factually distinguishable or dated. *See Smerling v. Dever,* 2015 WL 75016 (N.D. Ill. Jan. 6, 2015) (default judgment of $20,000 in compensatory damages entered for plaintiff who suffered broken nose and shoulder injury at the hands of prison employee where plaintiff offered evidence by way of affidavit only, rather than through an evidentiary hearing, and the presiding magistrate judge reasoned, "had Plaintiff testified at an evidentiary hearing…an amount closer to his demand might be warranted"); *Waits v. City of Chicago*, 2003 WL 21310277 (N.D. Ill. June 6, 2003) (jury returned verdict of $15,000 in compensatory damages and $2,000,000 in punitive damages after two police officers struck a handcuffed plaintiff in the head, face, neck, and groin and the court ordered remittitur to $45,000 for the punitive damages); *Brown v. Triche,* 660 F. Supp. 281 (N.D. Ill. 1987) (judge awarded $9,000 compensatory and $15,000 punitive damages, in 1987, after bench trial finding deputy sheriff liable for throwing plaintiff into a wall and punching and kicking him in the face and neck).

As highlighted above, McCoy suffered pain during his interaction with Mennerich, sustained physical injuries, and explained for the jury his emotional distress after the events of June 16, 2017. The jury award is rationally connected to the evidence. Moreover, the cases cited by Mennerich are unpersuasive, and do not present strong comparisons for this case. The Court finds the awarded compensatory damages to be reasonable given the circumstances of this case.

e. *Punitive Damage Award*

Mennerich argues that no evidence supported the jury's $15,000 punitive damages award, and further, that the Court erred in allowing the jury to even consider punitive

damages. Moreover, Mennerich contends that the punitive damages, while not excessive compared to the compensatory damages, are excessive when looking at the reprehensibility of his conduct, or lack thereof.

A jury may assess punitive damages in a civil rights action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983). In evaluating punitive damages, the Supreme Court offers three guideposts for courts to consider: the degree of reprehensibility of the misconduct; the disparity between the harm or potential harm suffered by the plaintiff and the punitive damage award; and the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-75 (1996). The Court designated the degree of reprehensibility of the defendant's conduct as the most important indicium of the reasonableness of a punitive damages award. *Id*. at 575.

Mennerich's conduct in this case, viewed in the light most favorable to McCoy, qualifies as reprehensible. According to the evidence, McCoy did not pose any threat to officers as he compliantly laid on the ground in a secured, padlocked walkway. Once officers targeted and engaged with him, he felt disrespected and struck an officer. He was already on the ground, suffered from leg pain that made it unlikely he would jump up, and quickly passed out. McCoy laid face down on a hard, jagged surface with his face and chin pushed into rocks and concrete chunks. The force used by Mennerich in thrusting his body on top of McCoy's was unnecessary to subdue McCoy. This unnecessary force evinced an intent to cause McCoy pain and suffering. The evidence also gives rise to a reasonable inference that Mennerich continued to inflict pain on McCoy after he was restrained, as a swarm of other

officers joined in kicking and stepping on him. This evidence, along with all the other evidence previously discussed, supports a conclusion that Mennerich's conduct was reprehensible and that he acted callously indifferent to McCoy's rights. As such, the jury was properly permitted to assess punitive damages.

Looking at comparable cases, the Seventh Circuit has upheld much higher punitive damage awards for similar conduct. *See Hendrickson,* 589 F.3d at 893-95 (Seventh Circuit upheld a jury's $125,000 punitive damages award where the correctional officer defendant slammed the prisoner plaintiff to the concrete floor and pressed his knees into plaintiff's back as another officer cuffed plaintiff); *Hagge v. Bauer,* 827 F.2d 101, 104, 110 (7th Cir. 1987) (upheld punitive damage award of $25,000, in 1987, against a police officer who kicked an arrestee breaking her leg); *Kunz v. DeFelice,* 538 F.3d 667, 678-80 (7th Cir. 2008) (affirmed $90,000 punitive damage award for pretrial detainee who was assaulted while restrained). The Court cannot find that the $15,000 punitive damage award, here, is excessive.

Based on the foregoing discussion, the Court finds no grounds to grant a new trial. Mennerich's Motion for Post-Trial Relief in the form of a new trial is **DENIED**. The Court also refuses Mennerich's request for remittitur regarding the awarded damages**.**

## III.   <u>Qualified Immunity</u>

Finally, Mennerich claims he is entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Leiser v. Kloth,* 933 F.3d 696, 701 (7th Cir. 2019); *see Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To determine whether a right is clearly established, courts consider whether the

violative nature of the particular conduct is clearly established in light of the specific context of the case. *Leiser*, 933 F.3d at 702. The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Although qualified immunity is an affirmative defense, once raised, the burden shifts to the plaintiff to defeat it. *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010). In demonstrating that the violated right was clearly established, "a plaintiff must show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (internal quotation marks omitted). In other words, while there is no requirement the "very action in question" must have previously been held unlawful, there must be settled authority that would cause a defendant to understand the illegality of his action. *Id; see also Lewis*, 581 F.3d at 478-79.

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (internal quotation marks and citations omitted). If officers of reasonable competence could disagree on this issue, immunity should be recognized. *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As noted above, with the facts viewed in the light most favorable to McCoy, the jury reasonably found that Mennerich violated McCoy's Eighth Amendment rights by using harmful force intended to cause pain rather than to restore discipline. Thus, the only remaining question is whether that right, within the specific circumstances of this case, was

clearly established. *Saucier*, 533 U.S. at 201. It is undisputed that "[t]he notion that unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment is not a new or unusual constitutional principle." *Hill v. Shelander*, 992 F.2d 714, 718 (7th Cir. 1993); *see Hudson*, 503 U.S. 1 (finding that the blows directed at the inmate, who was shackled and handcuffed after arguing with a prison guard, were not *de minimis*); *Hendrickson*, 589 F.3d 887 (upholding a jury verdict for a prisoner where a guard threw the inmate against a wall, slammed him onto a concrete floor, and kneed him in response to a single verbal insult); *but see Lunsford v. Bennett*, 17 F.3d 1574 (7th Cir. 1994) (finding that being hit in the head with a bucket, which caused daily headaches, during a "disturbance" at a prison is *de minimis*). As such, Mennerich is not entitled to qualified immunity.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Defendant Lt. Lucas Mennerich's (Doc. 136) Motion for Judgment as a Matter of Law and Post-Trial Relief.

**IT IS SO ORDERED.**

DATED:   February 6, 2023

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**